Gustafson, J., concurring in part and dissenting in part: I concur with the result of the majority opinion to the extent that it disallows a medical care deduction under section 213 for breast enhancement surgery, but I dissent to the extent that the majority allows a deduction for genital sex reassignment surgery. Petitioner is the father of three children from a marriage that lasted 20 years. Although physically healthy, he was unhappy with his male anatomy and became profoundly so, to the point of contemplating self-mutilation. Mental health professionals diagnosed him as suffering from Gender Identity Disorder (gid). With their encouragement, he received medical procedures: In years before the year at issue here, he received injections of female hormones[1] and underwent facial surgery and other plastic surgery; and then in the year at issue he paid a surgeon about $20,000 to remove his genitals, fashion simulated female genitals, and insert breast implants. After these procedures, petitioner “passed” as female and became happier. She[2] claimed an income tax deduction for the cost of this “sex reassignment surgery” (SRS). The question in this case is whether section 213 allows this deduction. I. Non-issues The surgical procedures involved in this case are startling, and to avoid distraction from the actual issues, it is expedient to affirm what is not at issue here: Neither the tax collector nor the Tax Court sits as a board of medical review, as if it were reconsidering, validating, or overruling the medical profession’s judgments about what medical care is appropriate or effective for what medical conditions. Likewise, neither the tax collector nor the Tax Court passes judgment on the ethics of legal medical procedures, since otherwise deductible medical expenses are not rendered non-deductible on ethical grounds. See, e.g., Rev. Rui. 73-201, 1973-1 C.B. 140 (cost of legal abortion held deductible under section 213). Rather, we decide only a question of deductibility for income tax purposes. In section 213 Congress created a deduction for “medical care”, thereby implicitly but necessarily importing into the Internal Revenue Code principles that rely in part on the judgments of the medical profession. Medical care that is given pursuant to medical consensus might later prove to have been unfortunate or even disastrous (such as thalidomide prescribed for morning sickness); but an eventual discovery that the care was ill advised would not affect the deductibility of that care for income tax purposes. To determine deductibility under section 213, we determine whether a procedure is “medical care” (as defined in that statute), not whether we would or would not endorse it as appropriate care. Neither the IRS nor the Tax Court was appointed to make such medical endorsements. Consequently, I accept the majority’s conclusions, based on expert medical testimony describing medical consensus,[3] that GID is a serious mental condition, that petitioner suffered from it, that the medical consensus favors SRS for a GID patient like petitioner, that SRS usually relieves the patient’s suffering to some significant extent, and that SRS was prescribed to and performed on petitioner in accord with prevailing standards of medical care. However, Congress did not cede to doctors the authority to grant tax deductions. As the majority acknowledges, majority op. p. 56, medical experts do not decide the interpretation of the terms in section 213. Rather, statutory interpretation is the domain of the courts. Although informed by medical opinion on the medical matters pertinent to medical expertise, the Court alone performs the judicial task of determining the meaning of a statute and applying it to the facts of the case before us, on the basis of the record before us. My disagreement with the majority concerns the interpretation and application of section 213(d)(9), by which Congress deliberately denied deductibility for “cosmetic surgery or other similar procedures”. II. “[Mjedical care”, “cosmetic surgery”, and “other similar procedures” in section 213 As a general rule, “personal, living, or family expenses” are not deductible. Sec. 262. As an exception to that general rule, Congress enacted in 1942 a deduction for “expenses paid * * * for medical care”, sec. 213(a); but in 1990 Congress carved out (and declared non-deductible) “cosmetic surgery or other similar procedures”, sec. 213(d)(9). We decide today whether SRS is deductible “medical care” or instead is nondeductible “cosmetic surgery or other similar procedures”. “Whether and to what extent deductions shall be allowed depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed.” New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934) (emphasis added). This case therefore requires us to determine whether there is “clear provision” for the deduction of SRS expenses. I conclude that section 213 is anything but clear in allowing such a deduction. A. The language of section 213 The definition of deductible “medical care” in section 213(d)(1)(A) and the definition of non-deductible “cosmetic surgery” in the exception in subsection (d)(9)(B) must be construed in tandem. The subsection reads in part as follows (emphasis added): SEC. 213(d). Definitions. — For purposes of this section— (1) The term “medical care” means amounts paid— (A) for the diagnosis, cure, mitigation, treatment, or prevention of disease, or for the purpose of affecting any structure or function of the body * * * :J: (9) Cosmetic surgery.— (A) In general. — The term “medical care” does not include cosmetic surgery or other similar procedures, unless the surgery or procedure is necessary to ameliorate a deformity arising from, or directly related to, a congenital abnormality, a personal injury resulting from an accident or trauma, or disfiguring disease. (B) Cosmetic surgery defined. — For purposes of this paragraph, the term “cosmetic surgery” means any procedure which is directed at improving the patient’s appearance[4] and does not meaningfully promote the proper function of the body or prevent or treat illness or disease. Thus, in 1942 “medical care” was defined in subsection (d)(1)(A) with two alternative prongs — first, a list of five modes of care for disease, i.e., “diagnosis, cure, mitigation, treatment, or prevention”;[5] and second, care that “affect[s] any structure or function of the body”. In 1990 the concepts of both these prongs were narrowed in subsection (d)(9)(B) for the purpose of creating a limited exception to the new disallowance of “cosmetic surgery or other similar procedures”. That is, appearance-improving procedures were declared to be non-deductible “cosmetic surgery”, but the definition given for that term provides a two-prong exception: These appearance-improving procedures are nonetheless deductible under (d)(9)(B) (i.e., are not “cosmetic surgery”) if they “meaningfully promote the proper function of the body” (i.e., not if they “affect[] any structure or function of the body”, as more broadly allowed in (d)(1)(A)) and are nonetheless deductible under (d)(9)(B) if they “prevent or treat” disease (i.e., not if they provide “diagnosis, cure, mitigation, treatment, or prevention of disease”, as more broadly allowed in (d)(1)(A)). Two features of this statutory language that are virtually overlooked in the majority opinion should be noted: First, section 213(d)(9)(A) disallows deductions for “cosmetic surgery or other similar procedures”. (Emphasis added.) That is, expenses for a procedure that falls outside “cosmetic surgery” (as defined in subsection (d)(9)(B)) may still be disallowed if the procedure is “similar” to “cosmetic surgery”. Congress thus enacted this disallowance in such a way that splitting hairs in order to find a procedure not to be within the specific definition of “cosmetic surgery” in (d)(9)(B) may not and should not save the day for its deductibility. Rather, deduct-ibility must be denied under (d)(9)(A) if the non-“cosmetic surgery” procedure is nonetheless “similar” to cosmetic surgery. Second, assuming that subsection (d)(9)(B) permits deduct-ibility if not both but only one of its prongs is satisfied (i.e., if a procedure only “prevents] or treat[s]”),[6] it must be noted that this second prong in subsection (d)(9)(B) has only two terms — “prevent” and “treat” — from among the list of five possible modes of “medical care” in subsection (d)(1)(A). I now turn to the significance of that wording. B. The different terminology of subsections (d)(1)(A) and (d)(9)(B) As is noted above, “medical care” is defined in subsection (d)(1)(A) by five terms — i.e., “diagnosis, cure, mitigation, treatment, or prevention”. Some of these terms do have some overlapping shades of meaning, and it seems likely that when this “medical care” deduction was first enacted in 1942, Congress simply intended to enact a broad definition of medical care and therefore chose terms to convey that breadth, without particular intention about the potential distinctive meanings of those terms. The distinctive meanings would have been irrelevant under the general provision that allowed the deduction if any of these modes of care was provided. That is, if a medical procedure was a “treatment” but not a “mitigation”, or was a “mitigation” but not a “treatment”, the expense would be deductible nonetheless under section 213(d)(1)(A). However, we consider here the very different and specific congressional intent 48 years later in 1990, when Congress enacted subsection (d)(9) to disallow deductions for cosmetic surgery. Congress provided an exception to this new dis-allowance, and allowed a deduction in the case of an otherwise cosmetic procedure, if it “prevents] or treat\js\ illness or disease”. Sec. 213(d)(9)(B) (emphasis added). According to this subsection, an otherwise cosmetic procedure will yield a deduction if it “prevents] or treat[s]” disease — i.e., two modes of care. Missing from this short list of deductible modes of care in subsection (d)(9)(B), as we have already noted, are three of the five terms in subsection (d)(1)(A), including “mitigation”. The 1990 Congress was thus undertaking to provide a limited exception to its new disallowance, and in so doing it was selective in choosing from the vocabulary at hand. Under the wording Congress adopted, if an otherwise cosmetic procedure “mitigates” a disease but cannot be said to “treat” or “prevent” it, then under the plain terms of the statute, one would have to conclude that the expense of that procedure is non-deductible. Congress provided that, to be deductible, an otherwise cosmetic procedure must “prevent or treat” a disease. Petitioner did not argue (and the majority does not hold) that SRS “prevents” GID (rather, SRS is offered only to persons who already suffer from the disorder, for whom “prevention” would come too late); so the contention must be that SRS “treats” GID. III. The meaning of “treat” in section 213(d)(9)(B) The majority implicitly holds that “prevent or treat” in section 213(d)(9)(A) is equivalent to, or is shorthand for, “diagnos[e], cure, mitigat[e], treat[], or prevent[]” in subsection (d)(1)(A) and that no narrow meaning should be ascribed to “treat”. Admittedly, it is possible to use the word “treat” in a loose manner that could include merely ameliorating the effects of a disease. In that loose sense, one could say that SRS “treats” GID by mitigating the unhappiness of the sufferer. “Treatment” and “mitigation” do appear side by side as modes of “care” in (d)(1)(A), reflecting different shades of meaning of the more general word “care”; and thus to some extent they are synonymous. If they were such close synonyms as to be equivalent in meaning (or if “treat” included “mitigate”[7]), then the absence of “mitigate” in (d)(9)(B) would not be significant. However, ascribing this broad or loose meaning to “treat * * * disease” is untenable under section 213, where “treat” must be distinguished from “mitigate”, and where the direct object is “disease” (not “patient” or “symptom”), as I now show. A. To yield a deduction, an appearance-improving procedure must “treat” disease (as opposed to effecting “mitigation”). Subsection (d)(9)(B) does not provide that appearance-improving procedures are deductible if they “prevent, treat, or mitigate” a disease, but rather if they “prevent or treat” disease. The majority’s leading definition of “treat”, majority op. p. 65, taken from Webster’s New Universal Unabridged Dictionary (2003), is “to deal with (a disease, patient, etc.) in order to relieve or cure”; and the same dictionary’s definition of “mitigate” is— 1. to lessen in force or intensity, as wrath, grief, harshness, or pain; moderate. 2. to make less severe * * *. 3. to make (a person, one’s state of mind, disposition, etc.) milder or more gentle; mollify; appease. A usage note observes that the “central meaning [of “mitigate”] is ‘to lessen’ or ‘make less severe’”. Thus, the two words “treat” and “mitigate” are by no means identical. Consequently, a question directed toward “treatment” of a disease may ask (using language from Webster’s): Did the procedure “deal with” the disease? Or it may ask (using language from Havey v. Commissioner, 12 T.C. 409, 412 (1949) (emphasis added)): “[D]id the treatment bear directly on the * * * condition in question”? But a question about “mitigation” may ask (using language from Webster’s): Did the procedure “make [the disease] less severe” or “lessen * * * pain”? And a comment that is framed in terms of “mitigation” may speak of “mitigation of the effects of his injury and disability”. Pols v. Commissioner, T.C. Memo. 1965-222, 24 T.C.M. (CCH) 1140 (1965) (emphasis added). Our Opinion in Starrett v. Commissioner, 41 T.C. 877, 881 (1964), includes such usage of both these terms. In Starrett we held that psychiatric expenses were “clearly ‘amounts paid for the diagnosis, cure, mitigation, treatment,’ and ‘prevention’ of a specific ‘disease’”; and we upheld the taxpayer’s argument that he underwent psychoanalysis— for the diagnosis of his emotional condition, cure of a specific emotional disease classified as anxiety reaction, mitigation of the effects upon him of such disease, treatment of the underlying causes of his anxiety reaction, and thereby the prevention of further suffering therefrom * * *. [Id.; emphasis added.] When “treat” and “mitigate” are distinguished, rather than being blended, “treatment” addresses underlying causes and “mitigation” lessens effects. I conclude that this distinction between “treat” and “mitigate” is critical to determining whether SRS “treats” GID, so as to render SRS expenses deductible. B. To yield a deduction, an appearance-improving procedure must treat “disease” (as opposed to treating a patient or a symptom). If the parties and the majority have in effect defined “treat” so broadly as to nearly encompass “mitigate”, they may have done so by overlooking the fact that, in section 213(d)(9)(B), the object of the verb “treat” is “disease”. The breadth of the dictionary definitions cited by the majority, majority op. p. 65, is attributable in part to the fact that one may “treat” a disease, or a patient, or a symptom. Consequently, a general definition of “treat” that is not confined — as section 213 is confined — to treatment of a disease should and will reflect shades of meaning appropriate for treatment of symptoms, which shades of meaning overlap more with “mitigate”. For that reason these general dictionary definitions are not very illuminating in this instance, where the question is whether to “treat” disease is or is not the same as to “mitigate” disease. As a part of “medical care”, one could “treat” a patient with palliative care or could “treat” his painful symptoms with morphine (both of which could also be said to “mitigate”, and the expenses of which would be deductible under section 213(a)) — all the while leaving his disease un-“treated”, strictly speaking. When Congress intends to enact a provision that turns on “treatment of patients”[8] or on “treatment of symptoms”,[9] it knows how to do so; but it did not do so in section 213(d)(9)(B), which allows deductions for procedures that “treat * * * disease”. (Emphasis added.) If a procedure is said to “treat * * * disease”, then “the treatment [will] bear directly on the * * * condition in question”, Havey v. Commissioner, supra at 412, or will “deal with” the disease (as in Webster’s). Other medical care may be “mitigation”, but not “treatment”. In defining “cosmetic surgery”, Congress aimed to deny deductions that had previously been allowed. If in the amended statute Congress had allowed deductions for appearance-improving procedures that “prevent, treat, or mitigate” a disease, then that broader exception might have undermined the intended limiting effect of the new disallowance. The majority’s loose interpretation of subsection (d)(9)(B) treats the statute as if Congress had enacted that imaginary broader exception, and its loose interpretation invites arguments for the deduction not only of GID patients’ SRS expenses but also of the cosmetic surgery expenses of any psychiatric patient who is (or claims to be) pathologically unhappy with his body.[10] In any event, Congress did not provide that an appearance-improving procedure will nonetheless be deductible if it merely “mitigates” a disease. C. A looser interpretation of “treat * * * disease” is not warranted in section 213(d)(9)(B). 1. The structure of subsection (d)(9)(B) shows deliberate restriction in its terminology. Congress enacted section 213(d)(9) to restrict medical care deductions by explicitly denying such deductions for cosmetic surgery and similar procedures. Its terms must be understood by reference to that announced purpose. Consistent with that purpose, subsection (d)(9)(B) reflects, as I have shown, a narrowing of both prongs of the subsection (d)(1)(A) definition of “medical care” — i.e., subsection (d)(l)(A)’s “affect[ ] any structure or function of the body” was narrowed to become “meaningfully promote the proper function of the body” in (d)(9)(B); and subsection (d)(l)(A)’s “diagnosis, cure, mitigation, treatment, or prevention of disease” was narrowed to become “prevent or treat” disease in (d)(9)(B). Where Congress was explicitly setting out to shut down deductions for cosmetic surgery, the restricting language it employed can hardly be taken as careless or unintentional. 2. The stricter interpretation of subsection (d)(9)(B) is consistent with (d)(9)(A). Because the particular question in this case is whether SRS falls within the definition of cosmetic surgery for which expenses are disallowed in subsection (d)(9)(B), the majority gives short shrift to subsection (d)(9)(A). Subsection (d)(9)(A) shows the sorts of exceptional procedures for which Congress meant to preserve deductions — i.e., procedures that are “necessary to ameliorate a deformity arising from, or directly related to, a congenital abnormality, a personal injury resulting from an accident or trauma, or disfiguring disease” — and thus illuminates the congressional purpose. Someone like petitioner who suffers from GID has no deformities that are addressed by SRS; he has no “congenital abnormality”; he has suffered no “accident or trauma, or disfiguring disease.” There is thus no indication that Congress explicitly intended to carve out, from its new disallowance, an exception that would reach SRS expenses. The wording choices in the statute that limit deductibility must be taken at face value in order to vindicate the undisputed congressional purpose. The majority not only ignores those implications of subsection (d)(9)(A) for the purpose of the statute but also renders much of (d)(9)(A) surplusage by its unduly loose interpretation of subsection (d)(9)(B). Subsection (d)(9)(A) provides that even if a procedure is “cosmetic surgery” (as defined in (d)(9)(B)), its expenses will be deductible if (inter alia) the procedure “ameliorate^] a deformity arising from, or directly related to, * * * disfiguring disease.” However, if surgical procedures that mitigate the effects of disease thereby fall outside the definition of “cosmetic surgery” (i.e., because they are deemed to “treat disease” in the broad sense), then subsection (d)(9)(A) would describe an empty set when it refers to “cosmetic surgery” that “ameliorate[s] a deformity arising from * * * disfiguring disease.” If the procedure “ameliorate^]”, and if to ameliorate is to “treat”, then the procedure would not be “cosmetic surgery” in the first place. Anything that “ameliorates” would be deductible because of the definition in (d)(9)(B), and the allowance in (d)(9)(A) would have no effect. On the other hand, if “treat * * * disease” in subsection (d)(9)(B) is given its precise meaning (not excluding from “cosmetic surgery” a procedure that only mitigates the effects of disease), then (d)(9)(A) would operate to allow a deduction for cosmetic surgery that does not “treat” a disfiguring disease but rather ameliorates deformities arising from it. Thus, only the precise meaning of “treat disease” in (d)(9)(B) harmonizes with the allowance in (d)(9)(A). 3. Broader usage of the word “treat” by doctors does not affect its significance in section 213(d)(9)(B). It appears that doctors sometimes use the word “treat” in this loose sense, so that they discuss SRS as a “treatment” for GID. See majority op. pt. III.D.l. However, as the majority indicates, majority op. p. 56, the meaning of statutory terms is within the judicial province, and we do not generally accept expert opinion on the meaning of statutory terms. In testimony in this case, doctors manifestly used the terms “care” and “treatment” almost interchangeably, without particular attention to whether it is the patient, the symptoms, or the disease that is being addressed; in section 213(d), however, “care” is a general term of which “treatment” is a mode distinct from “mitigation”, and deductible care is directed to “disease” (or “illness”), not to the patient or her symptoms. There is thus no indication that doctors’ usage of these words respects the distinctions that are important in section 213. With the foregoing understanding of the purpose and operation of section 213(d)(9), I now address the question whether SRS “treats” GID. IV. SRS does not “treat” GID for purposes of section 213(d)(9)(B). For the GID patient there is a dissonance between, on the one hand, his male body (i.e., his male facial appearance, his male body hair, his male body shape, his male genitalia, his male endocrinology, and the Y chromosomes in the cells of his body) and, on the other hand, his perception of himself as female. The male body conflicts with the female self-perception and produces extreme stress, anxiety, and unhappiness. One could analyze the GID patient’s problem in one of two ways: (1) His anatomical maleness is normative, and his perceived femaleness is the problem. Or (2) his perceived femaleness is normative, and his anatomical maleness is the problem. If one assumes option 2, then one could say that SRS does “treat” his GID by bringing his problematic male body into simulated conformity (as much as is possible) with his authentic female mind. However, the medical consensus as described in the record of this case is in stark opposition to the latter characterization and can be reconciled only with option 1: Petitioner’s male body was healthy, and his mind was disordered in its female self-perception. GID is in the jurisdiction of the psychiatric profession — the doctors of the mind — and is listed in that profession’s definitive catalog of “Mental Disorders”. See DSM — IV—TR at 576-582. When a patient presents with a healthy male body and a professed subjective sense of being female, the medical profession does not treat his body as an anomaly, as if it were infected by the disease of an alien maleness. Rather, his male body is taken as a given, and the patient becomes a psychiatric patient because of his disordered feeling that he is female. The majority concludes, majority op. p. 76 (emphasis added), that GID is a “serious mental disorder” — i.e., a disease in petitioner’s mind — and I accept that conclusion. A procedure that changes the patient’s healthy male body (in fact, that disables his healthy male body) and leaves his mind unchanged (i.e., with the continuing misperception that he is female) has not treated his mental disease. On the contrary, that procedure has given up on the mental disease, has capitulated to the mental disease, has arguably even changed sides and joined forces with the mental disease. In any event, the procedure did not (in the words of Havey v. Commissioner, 12 T.C. at 412) “bear directly on the * * * condition in question”, did not “deal with” the disease (per Webster’s), did not “treat” the mental disease that the therapist diagnosed. Rather, the procedure changed only petitioner’s healthy body and undertook to “mitigat[e]” the effects of the mental disease. Even if SRS is medically indicated for the GID patient — even if SRS is the best that medicine can do for him — it is an otherwise cosmetic procedure that does not “treat” the mental disease. Sex reassignment surgery is therefore within “cosmetic surgery or other similar procedures” under section 213(d)(9)(A), and the expense that petitioner incurred for that surgery is not deductible under section 213(a). Wells, Foley, Vasquez, and Kroupa, JJ., agree with this concurring in part and dissenting in part opinion. In the year at issue petitioner received $382 of hormone injections. The majority allows that deduction along with the deduction for genital sex reassignment surgery. I assume that the hormone injections are “similar” to cosmetic surgery and should therefore be disallowed under section 213(d)(9)(A), but I do not further address this de minimis deduction. Consistent with petitioner’s preference, I use feminine pronouns to refer to petitioner in her post-SRS state. However, this convention does not reflect a conclusion that petitioner’s sex has changed from male to female. The majority opinion acknowledges that in the psychiatric community there is a minority view that SRS is unethical and not medically necessary. Majority op. note 47 (citing testimony referring to Paul McHugh, “Surgical Sex”, First Things (November 2004), http:// www.firstthings.com/index.php (online edition)); majority op. p. 70; see also Holmes op. pts. I.B and II.B. However, if psychiatry has an intramural dispute about SRS, it will not be arbitrated by persons trained in tax law. 4 Petitioner contends that SRS is not “directed at improving the patient’s appearance” for purposes of section 213(d)(9)(B); respondent contends that it is; and the majority concludes, majority op. note 30, that it “need not resolve” the issue. On this basis, however, Judge Goeke’s concurrence would allow a deduction for the genital SRS because it “was not directed at improving petitioner’s appearance but rather was functional.” Goeke op. p. 101. His concurrence thus rightly discerns that section 213(d)(9)(B) distinguishes “improving * * * appearance” from “promotting] * * * proper function” (emphasis added); but there is no basis for the conclusion that SRS is “functional”. Petitioner’s SRS did not involve any attempt to confer female reproductive function. No one undertaking to “promote” sexual “function” would perform a penectomy and a castration on a healthy male body. On the contrary, SRS drastically terminates a male patient’s functioning sexuality. SRS did not change petitioner into a “function[ing]” female, but removed his salient male characteristics and attempted to make him resemble a woman — i.e., by petitioner’s lights, to “improveE ] the patient’s appearance”. The majority shows that the SRS surgeon does try to salvage, as much as possible, some possibility for subsequent sexual response, majority op. p. 41, and observes that SRS “alterfs] appearance (and, to some degree, function)”, majority op. p. 70 (emphasis added); but the majority makes no finding that petitioner proved that any identifiable portion of the SRS expense can be allocated to restoration of “function”. On our record, petitioner’s SRS must be said to have been directed at improving appearance rather than promoting function, and it is therefore within the definition of “cosmetic surgery”. Judge Holmes’s concurrence, on the other hand, attempts no analysis of function versus appearance, but rather proposes a different distinction not explicit in the statute: He would hold that SRS did not “so much improve [petitioner’s male] appearance as create a new [female] one.” Holmes op. p. 99 (emphasis added). This ingenious distinction, if accepted, might well undo the disallowance of deductions for cosmetic surgery, since plastic surgery is often marketed and purchased on the grounds that it supposedly creates a “new appearance”. But in fact, any surgery that gives the patient a “new appearance” has thereby “improved” the patient’s former appearance and is “cosmetic surgery” under section 213(d)(9)(B). The five terms employed to define “medical care” for income tax purposes in 1942 were borrowed from the definitions of “drug” and “device” added in 1938 to the Federal Trade Commission Act by the Federal Trade Commission Act amendments of 1938, ch. 49, sec. 4, 52 Stat. 114, currently codified at 15 U.S.C. sec. 55(c), (d)(2) (2006). The same five terms currently appear in virtually identical definitions of “medical care” in 29 U.S.C. sec. 1191b(a)(2)(A) (2006) (for purposes of group health plans under ERISA) and 42 U.S.C. sec. 300gg-91(a)(2) (2006) (for purposes of requirements relating to health insurance coverage). They also appear in definitions of “drug” and “device” in 21 U.S.C. sec. 321(g)(1)(B) and (h)(2) (2006) and in the definitions of “radiologic procedure” and “radiologic equipment” in 42 U.S.C. sec. 10003(2) and (3) (2006). They appear in their verb forms in 42 U.S.C. sec. 247d-6d(i)(7)(A) (2006) (defining “qualified pandemic or epidemic product”) and 21 U.S.C. sec. 343(r)(6) (2006) (restricting statements about dietary supplements). They appear as adjectives and gerunds, along with “therapeutic” and “rehabilitative”, in 26 U.S.C. sec. 7702B(c)(l) (defining “qualified long-term care services”). Thus, this fivefold list is not unique to the Internal Revenue Code. The majority (like the parties) interprets subsection (d)(9)(B) to permit deductibility if a procedure does not “meaningfully promote” but does “prevent or treat”; and the majority evaluates the expenses only under that second prong, to determine whether the procedures at issue here do “treat” disease. But see the opinion of Judge Foley, interpreting the definition in subsection (d)(9)(B) to disallow deductions for appearance-improving procedures unless a procedure both “meaningfully promote[s] the proper function of the body” and “prevents] or treat[s]” disease. The majority does not undertake to demonstrate that SRS “meaningfully promote[s] the proper function of the bod/’, and if the statute requires that both prongs be satisfied, then SRS must therefore be non-deductible. In this partial dissent, however, I assume arguendo that only one prong need be satisfied; and I show that even so, contrary to the majority’s conclusion, SRS does not “prevent or treat” GID and therefore cannot be deductible even under the majority’s one-prong analysis. By way of comparison, the absence of “cure” from section 213(d)(9)(B) is apparently not significant, because of the relationship of “treat” and “cure”. “Treat” is a broader word that includes “cure”. That is, although not everything that “treats” a disease undertakes to “cure” it, any procedure that does “cure” a disease necessarily “treats” it. See sec. 168(i)(2)(C) (emphasis added); see also sec. 5214(a)(3)(D); 10 U.S.C. sec. 1077 (2006); 21 U.S.C. sec. 802 (2006); 22 U.S.C. sec. 2161b-3 (2006); 24 U.S.C. sec. 225g (2006); 38 U.S.C. secs. 1706, 1718, 7332 (2006); 42 U.S.C. secs. 238b, 256e, 280e, 280g-6, 280h-3, 290dd-2, 2910, 300d—41, 1320b-8 (2006). See 8 U.S.C. sec. 1611(b)(1)(C) (2006) (emphasis added); see also 8 U.S.C. secs. 1613, 1621, 1632 (2006); 42 U.S.C. secs. 285o-4(d), 300cc-3, 1395i-3, 1396r (2006). Focusing on treatment of symptoms, Judge Halpem emphasizes, Halpern op. p. 79 (emphasis added), that petitioner’s expert pronounced petitioner “cured” (even though petitioner’s belief about her sex was unchanged) in the sense that “the symptoms of the disorder were no longer present”, e.g., “she had been free for a long time of clinically significant distress or impairment”; and Judge Halpem equates a removal of symptoms with a “cure” of the disease (and therefore a “treatment” of the disease), Halpern op. pp. 79-80. However, when treatment of symptoms makes a psychiatric patient content with his delusion, he has not been cured, and his “disease” has not been “treat[ed]” for purposes of section 213(d)(9)(B). See Diagnostic and Statistical Manual of Mental Disorders 576-582 (Body Dysmorphic Disorder (BDD)) (4th ed., text revision 2000) (DSM-IV-TR): “The essential feature of Body Dysmorphic Disorder (historically known as dysmorphophobia) is a preoccupation with a defect in appearance :f * *. The defect is either imagined, or, if a slight physical anomaly is present, the individual’s concern is markedly excessive * * *. The preoccupation must cause significant distress or impairment in social, occupational, or other important areas of functioning”. The entry for BDD in DSM-IV — TR is not in the record; but the majority refers to “DSM — IV—TR, which all three experts agree is the primary diagnostic tool of American psychiatry”, majority op. p. 60, and states that the U.S. Supreme Court has relied on a listing in the DSM in treating something as a “serious medical condition”, majority op. note 40; and I take judicial notice of the BDD entry. See, e.g., United States v. Long, 562 F.3d 325, 334-335 & n.22 (5th Cir.2009); United States v. Johnson, 979 F.2d 396, 401 (6th Cir. 1992). Whether BDD is a “disease” and whether cosmetic surgery purportedly prescribed for it could be “treat[ment]” under section 213(d)(9)(B) are questions yet to be litigated — if the majority’s broad interpretation of section 213(d)(9)(B) prevails.